<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
:
BRENDA DISMUKE,                    :
                                   :
          Plaintiff,               :      Civil Action No.
                                   :      05-5613 (FLW)
                                   :
     v.                            :
                                   :      **OPINION**
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
          Defendant.               :
                                   :
_____:

<u>**WOLFSON, United States District Judge**</u>

Plaintiff Brenda Dismuke ("Plaintiff") appeals from the final decision of the Commissioner of Social Security ("the Commissioner"), Michael J. Astrue[1], denying Plaintiff disability benefits under the Social Security Act.  The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  The issue before this Court is whether Plaintiff is entitled to disability insurance benefits under sections 216(i) and 223 of the Social Security Act for the period beginning on December 5, 1996 and continuing through August 13, 2001, when Plaintiff claims she was

_____

[1]The Court notes that Michael J. Astrue became the Commissioner of Social Security on February 2, 2007.  He is substituted for the former Commissioner, Jo Anne B. Barnhart, as the Defendant in this suit.

1

disabled under section 1614(a)(3)(A) of the Act.[2]  A disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than 12 months.  Upon reviewing the administrative record, the Court finds that ALJ's decision denying benefits is supported by substantial evidence. Thus, the final decision of the Commissioner is **AFFIRMED**.

I.    **PROCEDURAL HISTORY**

In March 1996, Plaintiff initially filed for social security benefits for disability with the Commissioner commencing December 5, 1995, due to combined impairment of the heart, back, knee, wrist, and for being on multiple medications.  Subsequently, the Commissioner denied Plaintiff's application on July 25, 1996, and on reconsideration in October 1996.  Plaintiff appealed the decision, and on January 6, 1998, she appeared before an Administrative Law Judge ("ALJ").  A decision was issued on February 25, 1998, affirming the Commissioner's decision to deny

_____

[2]Plaintiff filed her Appeal's Brief on March 20, 2007. Thereafter, the Commissioner filed his Brief in Response on April 19, 2007.  Plaintiff then requested an extension of time, on June 1, 2007, for thirty days to reply.  On the same day, the Court granted the request.  However, Plaintiff has failed to file her reply.  Therefore, the Court will only consider Plaintiff's initial Brief and the Commissioner's Brief in Response on this appeal.

Plaintiff disability benefits. The Appeals Council's review was requested by Plaintiff, but the Council denied the request. Accordingly, the ALJ decision became a final decision, which Plaintiff appealed to the United State District Court review pursuant to 42 U.S.C. § 405(g) ("First Appeal"). In Feburary 2002, the district court reversed the ALJ's decision and remanded for a new hearing. Thereafter, a hearing was held by an ALJ, and Plaintiff's claim for disability for the period of December 5, 1995 through August 13, 2001, was again denied. The Appeals Counsel denied review.

While the First Appeal was pending, Plaintiff filed a second application in June 1999. This application was also denied initially, and on reconsideration, by the Commissioner. However, a hearing in front of an ALJ was held on September 26, 2001, resulting in a finding that Plaintiff was disabled, for the purpose of social security disability benefits, as of August 21, 2001.[3] Accordingly, Plaintiff initiated the instant appeal to this Court for a finding of disability during the relevant time period from December 5, 1995 through August 13, 2001, or in the alternative, for a remand of the matter to the ALJ for a new hearing.

---

[3]Plaintiff was found disabled under Medical Vocational Guideline rule 201.12 as a result of her age (considered "closely approaching advanced age") and her residual functional capacity for sedentary work. Tr. 57.

## II.   STATEMENT OF FACTS

Plaintiff is 55 years old, (44 years of age at the onset), born on November 5, 1951.  She has a high school education, and has worked as a maintenance/office cleaner, office worker, and receiving clerk.  Plaintiff is 5'1" and weighed 200-235 pounds during the relevant time period.  According to Plaintiff, due to multiple severe physical impairments, she has not been able to work since December 5, 1995.  Plaintiff's Brief in Support at p. 3.

Plaintiff's Physical Condition

For the purpose of this Opinion, the Court shall refer to the lengthy Administrative Record.  At the supplemental hearing on December 18, 2002, Plaintiff testified that during the period of time in question, she was living by herself, and she drove, but not often. Admin. R. at 477.  Plaintiff previously worked as an office cleaner until December 1995 when she had an automobile accident. Id. at 477-78.  As an office cleaner, Plaintiff was on her feet all the time and had to lift and carry fifty to seventy-five pounds of trash or vacuum cleaners.  Id. at 478.  Prior to working as an officer cleaner, she worked for Sears, marking and pricing merchandise.  Id.  Plaintiff stopped working in December 1995 due to lower back pain, problems with her right knee, shortness of breath and tiredness.  Id. at 480.  Plaintiff attempted to return to work in February 1996 as a housekeeper, but was unable to continue working due to persistent back and knee pain.  Id. at 481-

4

82.  Plaintiff also returned to work in 1999 as a bottle inspector, but again was unable to continue due to pain.  Id. 482-83.  With respect to her physical condition, Plaintiff testified in a hearing that sitting down, changing positions, or icing lessened her pain. Id. at 483.  In fact, she had to change positions between sitting, standing, and lying down often.  Id. at 485.  Plaintiff took Darvocet, as needed, for pain.  Id. at 484.  Plaintiff further testified that she was able to use her hands for picking things up and fixing her hair, but could not lift a gallon of water with her right hand because it was difficult for her to use her right hand for strenuous activities and it bothered her if she used it for repetitive movements.  Id. at 485, 491.  During the relevant time period, Plaintiff stated that she could dust, wash dishes, do laundry and sew.

Plaintiff testified that she had two angioplasties in her right coronary artery, and had diabetes during the relevant period of time.  Id. at 492.  As such, she used a nitroglycerin patch. Id. at 492-93.  She also testified that she had shortness of breath from ordinary physical activity that would last ten to fifteen minutes.  Id. at 493.

Medical Evidence Dated Between December 5, 1995 and August 13, 2001

Plaintiff was seen by Dr. Irving Strouse between March 1992 and August 13, 1998.  Id. at 281-323.  Dr. Strouse treated Plaintiff for a ganglion cyst on her right wrist, which he removed

5

in June 1992.  Plaintiff next saw Dr. Strouse on December 5, 1995
for treatment of another cyst which had occurred one year prior.
Id. at 311-12.  On May 17, 1996, Dr. Harold Petersen noted in a
letter to the State Division of Disability Determinations that
Plaintiff had knee surgery earlier that month.  However, according
to Plaintiff's own statement in a Department of Labor Report of
Contact dated May 22,1996, she stated that she never had surgery on
her knee, but it "occasionally hurts" after being "banged up" in a
car accident years ago.  See Transcript submitted by Plaintiff
("Plaintiff's Transcript") at 156.  Plaintiff further stated in the
report that her knee problem did not prevent her from being able to
perform daily activities and was not the basis for her disability
claim.  Id.

On June 4, 1996, Plaintiff, again, had a ganglion cyst removed
from her right wrist.  In the same month, Plaintiff was examined by
Dr. Sam Wilchfort for complaints of shortness of breath with
activity and occasional swelling of the leg.  See Plaintiff's
Transcript at 157.  The doctor's report indicated that one of
Plaintiff's major problem was an enlarged heart but there was no
reported chest discomfort since March 1996.  Id.  Plaintiff did
have a history of hypertension since 1992, however, it was being
treated with medications, such as Cardizem and Lozol.  Id.
Plaintiff was also diagnosed with borderline diabetes, but it was
not being treated as of the date of the report.  Further, Plaintiff

complained of arthritis in the left hip, right shoulder, right knee and lumbosacral spine.  Id.  Upon physical examination, Plaintiff's blood pressure was 120/80; had clear lungs and no wheezing or rales; cardiac examination was normal; and a lateral chest x-ray showed no abnormalities.  Id. at 158.  In fact, the remainder of the examination was unremarkable.  Id.  Dr. Wilchfort assessed Plaintiff with obesity, shortness of breath, arthritis, status post removal of a cyst, and history of ulcers.  Id.

On August 2, 1996, Plaintiff had a thallium exercise stress test which showed a negative electrocardiographic response, a good physiologic response, a normal blood pressure response, and no chest pain induced.  Admin. R. at 181.  Nevertheless, on September 4, 1996, Plaintiff underwent percutaneious transluminal coronary angioplasty procedure.  Id. at 187.  She had a successful stenting of the proximal right coronary artery and was discharged a day later with a final diagnosis of chronic ischemic heart disease and hypertension.  Id. at 185-89.  Plaintiff was advised to have a low-fat diet, resume hypertension medications, and begin taking daily aspirin and Ticilid twice a day.  Id. at 186.

Soon thereafter, on September 8, 1996, Plaintiff went to the emergency room complaining of chest pressure and pain with mild shortness of breath and diaphoresis.  She was treated by Dr. Thomas White, D.O.  See Plaintiff's Transcript at 186.  Upon examination, Plaintiff's blood pressure was 112/68 and her heart had a regular

7

rate and rhythm without murmur.  Id. at 187.  Plaintiff was assessed with unstable angina, no definitive complications from the previous surgical heart procedure, though, she was again diagnosed with hypertension and obesity.  Id.  Dr. White further stated that Plaintiff was awaiting knee surgery.  Plaintiff had another thallium stress test on September 9, 1996, which was normal with no evidence of ischemia or infarction.  Admin. R. at 194-95.  In addition, Plaintiff's treating physician, Dr. Strouse, submitted a Report dated September 12, 1996, stating that due to Plaintiff's multiple aliments (i.e., wrist injury, cardiac and knee difficulties, and residual back problem from prior car accident), she was unemployable at that time.  See Plaintiff Transcript at 194-95.

On December 13, 1996, Plaintiff had a diagnostic arthroscopy and surgical arthroscopy with medical-femoral chrondoplasty of her right knee.  Admin. R. at  272-75. Plaintiff was to start physical therapy.  Id. at  293.  On January 5, 1997, Plaintiff again was admitted to the hospital for chest pain.  An angioplasty of the right coronary artery and cardiac catheterization were performed. Id. at 200-01.  Plaintiff was discharged on January 10, 1997, with a final diagnosis of intermediate coronary syndrome, obesity, and hypertension.  Id. at 200.

On January 20, 1997, Plaintiff was seen by  Dr. Strouse who noted that she was doing well as far as her knee was concerned; it

was moving well and the swelling was down. Id. at 297. In fact, a March 5, 1997 treatment note from Dr. Strouse stated that Plaintiff's knee had improved and therefore she had stopped physical therapy. Id. at 292.

Plaintiff was seen at the hospital on April 13, 1997. Id. at 224. She complained of chest pressure associated with shortness of breath, nausea and diarrhea. Id. During that time, Plaintiff stated to Dr. White that she had done well for over two months after her last angioplasty in January 1997. However, symptoms of chest pressure had reoccurred. After a catheterization and coronary angiography, Dr. White concluded that there were no significant obstructive artery disease, although Plaintiff still had a mild systolic hypertension. Id. at 232-34. She was discharged in satisfactory condition. Id. at 224.

A May 5, 1997 treatment note from Dr. Strouse showed that plaintiff was doing "very well" as far as her knee and wrist were concerned; though she was having some back pain. Id. at 290. Dr. Strouse further noted on June 9, 1997, that plaintiff had a good range of motion of her knee without swelling or pain, and that she had a negative exam of her wrist with no swelling and excellent healing. Id. at 292. She had a problem in her back with right sciatica but had no neurological deficits. Id. As such, Dr. Strouse discharged Plaintiff and stated that he would see her when necessary. Id.

Plaintiff, in July 1997, consulted with a chiropractor, Dr. Brian Telesz, D.C., based on her persistent complaints of neck, shoulder, back and right wrist pain.  Dr. Telesz's findings were as follows: due to injury secondary to motor vehicle accident dated December 14, 1995, Plaintiff has chronic cervical facet syndrome; adhesive capsulitis of the right shoulder; right wrist sprain/peripheral entropment neuropathy; and lumbar spondylosis with sciatic radicular neuropathy.  Plaintiff's Transcript at 198-200.  Additionally, Plaintiff's magnetic resonance imaging revealed straightening of the lumbar lordoctic curve, L4-L5 disc desiccation, thinning and bulging, which contributed to a limited motion of the back.  Admin. R. at 291.  Treatment consisted of physical therapy and rehabilitative training two to three times a week.  Plaintiff's Transcript at 200.

On August 11, 1997 to August 16, 1997, Plaintiff again was admitted to the hospital for complaints of chest pain.  Admin R. at 247.  Dr. White was the treating physician.  He indicated that "the patient was admitted to the hospital with a recurrence of substernal chest pressure and heaviness similar to her angina symptoms.  Her history is somewhat clouded by the fact that she has known gastroesophageal reflux disease, known history of coronary artery disease in the past with a stent to the right coronary artery and musculoskeletal pains quite frequently."  Id.  After numerous tests, Plaintiff was treated for pain over the sternum

10

with Motrin and was to follow up with a gastroenterologist and continue with her medications.  Id. at 248.  Plaintiff's activity was to be limited only by her symptoms.  Id.  Chest x-rays showed no cardiomegaly or mediastinal widening and essentially clear noncongested lungs.  Id.  During the same month, Dr. Strouse noted that Plaintiff's right knee had a full range of motion with no effusion or specific tenderness.  Id. at 290.  Plaintiff had some residual pain in the knee.  Id.

On November 25, 1997, Plaintiff was referred to, and evaluated by, cardiologist, Dr. Marek Mrzyglocki, due to a chronic cough.  Id. at 331.  Examination showed Plaintiff was in no acute distress, her blood pressure was 136/90 and she weighed 221 pounds.  Id. at 332.  Plaintiff's cartoid upstroke was within normal limits, and her lungs revealed normal vesicular breathing.  Id.  Her extremities had no clubbing, cyanosis or edema.  Id.  Dr. Mrzyglocki found no cardiac reason for Plaintiff's cough; she was not in congestive heart failure.  Id.  Plaintiff was then switched from Tiazac to Norvasc to see if that would reduce her cough.  Id. It was suggested that Plaintiff had a postnasal drip or gastric reflux.  Id.

In December 1997, due to persistent pain in her knee, Dr. Strouse referred Plaintiff to Dr. William Gerhardt, M.D., for a MRI of her right knee, which showed mild joint effusion and no evidence of ligament or meniscal tear.  Id. at 288.  Accordingly, Dr.

Strouse, in a letter dated January 15, 1998, requested authorization for an arthroscopic surgery on her right knee. Plaintiff's Transcript at 204. Subsequently, on March 3, 1998, Plaintiff underwent another surgery of her right knee due to cartilage damage. Admin. R. at 267-71. Thereafter, a March 5, 1998 note from Dr. Strouse showed that Plaintiff was recovering well and was to start physical therapy. Id. at 283. On May 21, 1998, Dr. Strouse stated that Plaintiff had just returned from a trip to Florida and was to restart physical therapy. Id. at 282. Reports from Plaintiff's physical therapy in September and October 1998 show that she was feeling markedly better. Id. at 338.

A series of follow-up tests were conducted in October 1998 of Plaintiff's chest. Specifically, on October 14, 1998, Dr. Charles Perrine took an x-ray of Plaintiff's chest, which showed no evidence of pulmonary infiltration; her heart was not enlarged; and there were no significant abnormalities. Id. at 327. On October 22, 1998, Dr. Donald P. Ferri, in a report, stated that Plaintiff's stress sestamibi showed "absolutely no evidence for stress induced ischemia." Id. at 324. Dr. Ferri felt that no further testing or medication changes were necessary. Id.

Plaintiff was seen in the University Medical Center on June 12, 1999; she was diagnosed with angina, treated, and released in stable condition. Id. at 375. Plaintiff had angina secondary to suboptimal medication and was directed to take her medication

12

religiously.  Id.  She was to avoid strenuous activity.  Id.  On August 2, 1999, Plaintiff was examined by Dr. Thao X. Le, for complaints of chest, back, right hip and left knee pain.  Id. at 383.  Upon examination, Plaintiff's skin, head, ears, eyes, nose, oral cavity, abdomen, upper extremities, and neck were normal.  Id. at 385.  Plaintiff's chest was normal with clear lungs, full chest expansion, and symmetrical full respiration without retractions. Id.  Examination of Plaintiff's heart showed it was normal in size, rate and rhythm, with no murmur or pain.  Id.  Her radial pulse was regular and symmetric in force.  Id.  Plaintiff's spine was normal with no swelling, tenderness, numbness, and no evidence of kyophosis or scoliosis, or flattening of lumbar lordosis.  Id. Plaintiff had no pain and no loss of range of motion of the thoracic or cervical spine in the sitting or supine position.  Id. There was no evidence of paravertebral muscle spasm.  Id. Furthermore, examination of Plaintiff's lower extremities showed no swelling, numbness, tenderness, no loss of motion, normal gait, normal straight leg raising bilaterally in the supine position, and an ability to squat half way without pain.  Id.  Tests showed Plaintiff's right knee and lumbosacral spine were normal, but her right hip had degenerative changes.  Id. at 386.  Ultimately, Dr. Le diagnosed Plaintiff with coronary artery disease, angina, lumbar

pain of unknown etiology, and right hip and right knee pain.[4]   Id.

Plaintiff was admitted to the Baptist St. Vincent's Hospital on November 16, 1999, for complaints of chest pain and was diagnosed with unstable angina, hypertension, non-insulin dependent diabetes mellitus, and hypercholesterolemia.  Id. at 401; see also Id. at 398-438.  Plaintiff's physical examination was unremarkable. Id. at 401-02.  Plaintiff was placed on Telemetry and her angina resolved.  Id. at 402.  Plaintiff had a normal stress test and echocardiogram, which revealed that her cardiac enzymes remained normal and her electrocardiograms also remained normal.  Id. Upon examination, Plaintiff was discharged two days later and was instructed to take Imdur, Pravachol, Morvasc, Prevacid, metrolol, hydrochlorothiazide, glucotrol, and aspirin once a day.  Id.

On February 25, 2000, a state agency physician, Dr. Puestro, reviewed Plaintiff's medical file and concluded that Plaintiff could frequently lift or carry ten pounds, could occasionally lift or carry twenty pounds, could stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push and pull.  Id. at 451-58.  Dr. Puestro assessed Plaintiff with the

---

[4]On August 6, 1999, Plaintiff's file was reviewed by State agency doctor, Reuben Brigety.  Admin. R. at 39, 390-97.  Dr. Brigety concluded that Plaintiff had the ability to perform work requiring a light level of exertion limited to occasional climbing, kneeling, and crouching.  Id. at 391-92.  A September 9, 1999 treatment note from the Hillard Health Department showed that Plaintiff was doing well with no complaints.  Id. at 449. She was actively seeking employment.  Id.

ability for only occasional postural activities such as climbing, stooping and kneeling.  Id. at 453.

Testimony of the Vocational Expert

At the ALJ's request, a vocational expert testified during the hearing.  The expert opined that Plaintiff's past jobs in merchandising and as an office cleaner were both unskilled and required a medium level of exertion.  Admin. R. at 504.  The AJL posed the question to the expert whether a hypothetical individual with the same vocational background, limited to sedentary work with only occasional bending, stooping, crouching, kneeling, crawling, could have any other work.  Id.  The vocational expert testified that such a hypothetical individual could perform the jobs of: surveillance system monitor, which is sedentary, unskilled work with 42,500 jobs in the national economy and 1,650 jobs in the state of New Jersey; and information clerk, which is sedentary, unskilled work with 750,000 jobs in the nation and 2,250 in the state.  Id. at 504.  The vocational expert further testified that a person also limited to jobs that allowed an option to sit or stand, and required only occasional use of the dominant upper extremity could also perform those jobs.  Id. at 505.  However, in response to questioning by Plaintiff's counsel, the expert did testify that if someone needed to stop for a few minutes due to occasional chest pains, he/she would not be able to work.  Id.

Decision and Findings of the ALJ from the December 18, 2002 Hearing

Plaintiff testified at the hearing on December 18, 2002, that she stopped working after being injured in an accident on December 4, 1995. She reported neck, back, hip, right knee and right wrist pain, and noted that the side effects of her medication resulted in headaches and nausea. Plaintiff also indicated that she had diabetes, and due to her heart problems, she suffered from shortness of breath, sleep difficulties, and was constantly tired. Plaintiff also used a nitroglycerin patch during the time period at issue. She further complained of right handed numbness and occasional pain. Plaintiff estimated that she could only walk one-half block, could not sit long due to pain and discomfort, and rarely drove a car.

Moreover, during the hearing, Plaintiff's sister, Ms. Witcher, testified that Plaintiff used to be agile and exuberant, but complained of being fatigued and extremely tired all the time after developing heart problems. Plaintiff also complained about her pain, and that she no longer did much around the house. While she still did simple chores, such as washing the dishes, she no longer did other onerous tasks.

The ALJ made the following findings and decision:

    1.  The claimant met the nondisability
    requirements for a Period of Disability and Disability
    Insurance Benefits set for the Section 216(I) of the
    Social Security Act on December 5, 1995 (her alleged
    onset date) and was insured for benefits only through
    June 30, 1999.

16

2.   The claimant did not engage in substantial gainful activity during the closed period remaining at issue.

3.   During the closed period at issue, the claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations (20 CFR §§ 404.1520(b) and 416/920(b)).

4.   These medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   The claimant's allegations regarding her limitations are not totally credible.

6.   During the closed period at issue, the claimant had the residual functional capacity to perform a wide or significant range of sedentary work; i.e., she could lift and carry up to 10 pounds, and could stand for 1 hour, walk for 1 hour and sit for 6 hours in an 8-hour workday.  However, the claimant required the option to be able to sit or stand at will, and could only use her right (dominant) upper extremity occasionally.

7.   The claimant was unable to perform any of her past relevant work during the closed period at issue. (20 CFR §§ 404.1565 and 416.965).

8.   The claimant was 44-years old on December 5, 1995 (her alleged onset date); i.e., a "younger individual" (20 CFR §§ 404.1563 and 416.963).

9.   The claimant has a high school education.

10.  The claimant has an unskilled work background.

11.  During the closed period at issue, the claimant had the residual functional capacity to perform a wide or significant range of sedentary work.

12.  Although the claimant's exertional limitations did not allow her to perform the full range of sedentary work, based upon the testimony, based upon

17

> the testimony of the vocational expert and using the
> Medical-Vocational Rule 201.21 as a framework for
> decision-making, there are a significant number of jobs
> in the national economy that she could perform.
> Examples of such jobs include work as a surveillance
> systems monitor and an information clerk.

See Admin. R. at 36-37 (ALJ's February 26, 2003 Decision).

Pursuant to these findings, the ALJ held that Plaintiff was not under a "disability," as defined in the Social Security Act, during the closed period beginning on December 5, 1995 through August 13, 2001; therefore, Plaintiff's claim of disability benefits for that time period was denied.  Id. at 37.

## II.  DISCUSSION

### A.  Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions as to questions of fact are conclusive upon a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); see Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must scrutinize the entire record to determine whether the Commissioner's findings are supported by such evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is

"highly deferential."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance.  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for that of the factfinder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

**B.  Standard for Entitlement of Benefits**

Disability insurance benefits may not be paid under the Social Security Act ("SSA") unless Plaintiff first meets the statutory insured status requirements.  See 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see Plummer, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such

19

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).

The SSA establishes a five-step sequential process for an ALJ's evaluation of whether a person is disabled.  <u>See</u> 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he is not currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a); <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-47 n.5 (1987).  A claimant currently engaged in substantial gainful activity is automatically denied disability benefits.  <u>See</u> 20 C.F.R. § 404.1520(b); <u>see</u> <u>also</u> <u>Bowen,</u> 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); <u>see</u> <u>Bowen</u>, 482 U.S. at 146-7 n.5.  Basic work activities relate to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." <u>Id.</u> A claimant who does not have a severe impairment is not disabled.  20 C.F.R. § 404.1520(c); <u>see</u> <u>Plummer</u>, 186 F.3d at 428.  Third, if the impairment is found to be severe, the ALJ determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R.

Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. §
404.1520(a)(4)(iii). If the claimant demonstrates that her
impairments are equal in severity to or meet those on the
Impairment List, the claimant has satisfied her burden of proof and
is automatically entitled to benefits. See 20 C.F.R. §
404.1520(d); see also Bowen, 482 U.S. at 146-47 n.5. If the
specific impairment is not listed, the ALJ will consider the
impairment most like the impairment to decide whether the
impairment is medically equivalent. See 20 C.F.R. § 404.1526(a).
If there is more than one impairment, the ALJ then must consider
whether the combination of impairments is equal to any listed
impairment. Id. An impairment or combination of impairments is
basically equivalent to a listed impairment if there are medical
findings equal in severity to all the criteria for the one most
similar. Williams, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the
criteria set forth in the Impairment List, step three is not
satisfied, and the claimant must prove at step four whether she
retains the residual functional capacity to perform her past
relevant work ("PRW"). 20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at
141. If the claimant is able to perform her previous work, the
claimant is determined to not be disabled. 20 C.F.R. §§
404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42. The claimant
bears the burden of demonstrating an inability to return to the

past relevant work.  Plummer, 186 F.3d at 428.  Finally, if it is determined that the claimant is no longer able to perform her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy."  Bowen, 482 U.S. at 146-47 n.5; Plummer, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  Id.

### D.  Plaintiff's Arguments on Appeal

Plaintiff first contends that while the ALJ determined that each of Plaintiff's impairments failed to meet the requirements of the Impairment List to constitute a disability, the ALJ failed to properly consider, compare and discuss multiple impairments and whether they, in the aggregate, meet the requirements of the Impairment List, or in combination are equivalent to one of the disabilities on the list.  Additionally, Plaintiff contends that the ALJ erred in calculating Plaintiff's RFC, and did not sustain the burden required at Step five of the sequential evaluation because the ALJ assessment did not include her symptoms and non-exertional limitations. It seems that Plaintiff next contends that the ALJ's determination of whether there were other jobs in the

national economy that Plaintiff could perform is erroneous because
the ALJ only relied on the Medical Vocational Guidelines, and not
on the testimony of the vocational expert.  Plaintiff further
argues that the ALJ improperly evaluated Plaintiff's subjective
complaints of pain.  The Court will now address each of Plaintiff's
contentions.

### 1.   Step Three: Whether Plaintiff's Impairments Match or are Equal to a Listed  Impairment

By way of a brief summary, Plaintiff's alleged disability
occurred on December 5, 1995.  Based on the medical evidence, the
ALJ correctly determined that, at Step Two of the sequential
evaluation, Plaintiff had the following severe impairments, which
the parties do not dispute: coronary artery disease, atypical chest
pain, obesity and back and knee pain.  However, because the ALJ
concluded that these impairments did not meet the requirements of
the Impairment List, Plaintiff did not have a disability according
to the list.  The ALJ next determined that based on the vocational
expert's testimony, Plaintiff's own testimony, and the Medical
Vocational Guide, Plaintiff could have performed other work in the
national economy.  Therefore, Plaintiff was not disabled pursuant
to the SSA.

Plaintiff first argues that the ALJ failed to consider
Plaintiff's impairments in combination when identifying whether
they met the requirements of the Impairment List.  Contrary to
Plaintiff's argument, in his decision, the ALJ concluded that

23

Plaintiff "did not [have] an impairment or combination of impairments which was severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4." Admin. R. at 23. With regard to Plaintiff's cardiovascular impairment, the ALJ thoroughly considered Section 4.04C - coronary artery disease. By carefully sorting through the medical evidence since 1996, the ALJ repeatedly referred specifically to past medical exams and reports to arrive at the conclusion that even taking the cumulative effects of Plaintiff's hypertension, shortness of breath, chest pain, fatigue and obesity into consideration, the evidence showed that Plaintiff's cardiac condition did not satisfy the listing requirements of Section 4.04.C. Indeed, Plaintiff's November 16-18, 1999 hospitalization, due to unstable angina, hypertension, noninsulin dependent diabetes mellitus, and hypercholesterolemia, demonstrated that Plaintiff's cardiac condition was normal. Particularly, the tests tended to show that Plaintiff's left ventricular regional wall motion and systolic function were normal. In fact, even as early as April 1997, a chest x-ray revealed no evidence of acute coronary disease, and that the chest pain was non-cardiac related. Moreover, in October 1998, another chest x-ray showed that there was no existence of enlargement of the heart. Because substantial medical evidence demonstrated that Plaintiff's condition did not reveal the required 50% or more narrowing of a non-bypassed left main coronary

artery, the ALJ did not err in finding that Plaintiff's coronary condition did not satisfy the requirements of the Impairment List.

With regard to Plaintiff's orthopedic problems (i.e., back, neck and right knee problems), the ALJ also did not err in finding that the problems as a whole did not approach the listing level severity of Section 1.00 - Musculoskeletal impairments.  Again, to arrive at that determination, the ALJ scrupulously discussed the medical evidence to reach the decision that Plaintiff's knee impairment fell short of Section 1.02A of the Impairment List (Major dysfunction of a major-bearing joint).  Essentially, Plaintiff had to show that due to her impairment, she was unable to ambulate effectively (i.e., could not sustain a reasonable walking pace over a sufficient distance to able to carry out activities of daily living).  Indeed, according to the medical evidence, Dr. Le noted in August 1999 that "claimant had no difficulty getting on and off the examining table and chair.  And, there was no neck pain or limitation of range of motion, and the spine had no swelling, tenderness or numbness . . . [t]here was no swelling, numbness or tenderness in the knees, although there was pain with no limitation of motion of the right knee."  Admin R. at 25.  In fact, in May 1997, Plaintiff's treating physician, Dr. Strouse, noted that Plaintiff was doing "very well" as far as her knee and wrist were concerned; though she was having some back pain.  Dr. Strouse further noted that in June 1997, Plaintiff had a good range or

motion of her knee without swelling or pain in her knee, and that she had a negative exam of her wrist with no swelling and excellent healing since the wrist surgery.   Even after Plaintiff's second surgery of her right knee, Dr. Strouse noted that Plaintiff recovered well, and in May 1998, Plaintiff should restart physical therapy after just returning from a trip in Florida.   Even more telling are Plaintiff's physical therapy reports in September and October 1998, which showed that she was feeling markedly better. As late as February 25, 2000, Dr. Puestro, a state agency physician, concluded that Plaintiff could frequently lift or carry ten pounds, could occasionally lift or carry twenty pounds, could stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push and pull.   While the Court appreciates the physical impairments that Plaintiff endured during the relevant period of time, the Court ultimately finds that the ALJ's findings were based on substantial evidence, and that Plaintiff's knee problems never approached the severity of listing Section 1.02A.[5]

In addition, with respect to the back and neck pain, the ALJ

---

[5]Additionally, the ALJ pointed out that Plaintiff's ability to ambulate effectively was evident through the fact that she never required a cane or other device to assist her, and that Plaintiff on several occasions indicated that she was able to do her activities of daily living (i.e., cooking, light cleaning, laundry), but needed to take rest breaks.   Plaintiff further indicated that she was able to drive, and stated that although her knees gave out, she had never fallen.

found that the evidence did not show that Plaintiff's impairments
met the requirement of the listing Section 1.04A - Disorders of the
spine.  The ALJ found that based upon the evidence, there is no
indication of the required motor loss (atrophy with associated
muscle weakness) accompanied by sensory or reflex loss.  In
addition, "there is no appropriate medically acceptable imaging
revealing compromise of either the nerve root or spinal cord, or
other evidence of nerve root compression characterized by neuro-
anatomic distribution of pain and limitation of motion." Admin. R.
at 26.  Sorting through the evidence, this Court fails to find even
one medical report or test that conclusively establishes
Plaintiff's spinal problems amounted to such severity as required
under the Impairment List.  In fact, Plaintiff's Brief in support
of the appeal fails to cite to any evidence that the ALJ might have
overlooked or mistakenly construed.  Importantly, Plaintiff's
argument is that the ALJ failed to review Plaintiff's impairments
in combination, as opposed to challenging the underlying validity
of the ALJ's determinations.  However, the ALJ's conclusions did
include Plaintiff's conditions individually, and as a whole, on the
issue of whether she met the requirements of the Impairment List.
Significantly, Plaintiff never identifies which listing she claims
to meet or equal, nor does she identify the medical evidence
supporting that claim. Accordingly, the Court concludes that there
was substantial evidence in the record supporting the ALJ's

conclusions with regard to whether Plaintiff's conditions met, either individually or in combination, the requirements of the Impairment List.[6]

### 2. Step Four: Whether Plaintiff's Residual Functional Capacity Enables Her to Perform Past Relevant Work

In Step Four, the ALJ must determine whether a claimant's Residual Functional Capacity ("RFC") enables her to perform her past relevant work. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000). This step involves three sub-steps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work. See 20 C.F.R. § 404.1561; Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). Both residual functional capacity and past relevant work may be classified as either "sedentary," "light," "medium,"

---

[6]The Court notes that Plaintiff never offered or explained which combination of impairments the ALJ failed to analyze. According to the ALJ's decision, the ALJ properly grouped the impairments into three separate categories based upon the Impairment List (i.e., cardiovascular, musculoskeletal and spinal). Even if Plaintiff were suggesting that the ALJ must group all impairments into one category, Plaintiff has failed to identify which impairment from the list would be equivalent to her conditions. Thus, the Court finds the ALJ's decision, with respect to Step Three of the sequential analysis, was based upon substantial evidence in light of the requirements set forth by the Impairment List.

"heavy," or "very heavy."  Burnett, 220 F.3d at 121.

In determining whether a claimant retains sufficient RFC to return to past relevant work, the burden of proof is on the claimant to demonstrate his or her inability to perform such work. Plummer, 186 F.3d at 428.  In deciding whether the claimant has satisfied his or her burden of proof, the ALJ must review all of the medical findings and other evidence presented.  Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994).  The ALJ must consider and weigh all of the non-medical evidence before him, including claimant's allegations of pain, Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000), but "allegations of pain and other subjective symptoms must be supported by objective medical evidence."  Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529).  As long as the ALJ's conclusion is supported by substantial evidence in the record, the Court is bound by the ALJ's decision.  Knepp, 204 F.3d at 83.  While the ALJ may reject medical evidence due to its boilerplate nature, the ALJ is required to consider all aspects of a case before rejecting such evidence.  Miller v. Comm'r of Soc. Sec., 172 F.3d 303, 305-06 (3d Cir. 1999).  The ALJ, however, should be afforded substantial discretion to give little weight to a medical report if such report does not reflect the specific applicant's condition and is not supported by other evidence.  Id.  A physician's ultimate conclusion on disability is not binding on the ALJ.  Id. at 306-07.

In the present case, the ALJ determined that Plaintiff had the RFC for work requiring sedentary level of exertion.[7]   However, Plaintiff argues that the ALJ failed to properly calculate Plaintiff's RFC.   Specifically, Plaintiff argues that the ALJ failed to adequately explain how Plaintiff "could work on a sustained basis with [his] assessment."   See Plaintiff's Brief in Support of the Appeal at p. 25.   Plaintiff further argues that the ALJ's RFC assessment did not include her symptoms and non-exertional limitations.   Id. at 24.

In making the assessments, the ALJ first considered all of Plaintiff's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of the SSA.   The ALJ identified Plaintiff's complaints of high blood pressure, shortness of breath, chest pains, fatigue, right knee injury, back and ankle pain.   The ALJ next considered that in light of the objective medical evidence presented, Plaintiff's ability to perform work activities was not

---

[7]Sedentary work involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."   20 C.F.R. 404.1567.   The job of sedentary work generally involves standing or walking no more than about two hours, and sitting approximately six hours in an eight hour work day.

significantly limited by her physical impairment. As such, the ALJ found that Plaintiff retained the functional capacity to perform a wide or significant range of sedentary work, i.e., she could lift and carry up to 10 pounds, and could stand for 1 hour, walk for 1 hour and sit for 6 hours in an 8-hour workday.

Based on substantial evidence, the Court finds the ALJ did not err in calculating Plaintiff's RFC. In a six-page analysis, the ALJ discussed Plaintiff's medical evidence relating to her complained physical symptoms. Specifically, Plaintiff's treating physician, Dr. Strouse, indicated that in January 1997, Plaintiff was doing well as far as her knee was concerned. Plaintiff's knee was moving well and swelling was down. A March 5, 1997 treatment note showed that Plaintiff was doing very well and had stopped physical therapy for her knee. By August 1997, Dr. Strouse noted that Plaintiff's right knee had a full range of motion with no effusion or specific tenderness.

Moreover, Plaintiff's cardiologist, Dr. Mrzyglocki, in November 1997, found that Plaintiff's heart examination was normal, lungs had vesicular breathing, and an electrocardiogram revealed normal sinus rhythms. Dr. Mrzyglocki further diagnosed that Plaintiff was not in congestive heart failure. Similarly, a year later, Dr. Perrine noted that, despite Plaintiff's persistent complaints, Plaintiff had no evidence of pulmonary infiltration, her heart was no longer enlarged and there were no significant

31

abnormalities.  In August 1999, Dr. Le concluded that Plaintiff had a normal chest with clear lungs; full chest expansion, symmetrical full respiration without retractions; her heart was normal in size, rate and rhythm, with no murmur or pain; her pulse was regular; her spine was normal with no swelling, tenderness, or flattening of lumbar lordosis; she had no loss of range of motion of the thoracic or cervical spines; and no evidence of paravertebral muscle spasm. Plaintiff's legs had no swelling, numbness, tenderness, no loss of motion, and she had a normal gait and normal straight leg raising bilaterally in the supine position.  Tests further showed that Plaintiff's right knee and lumbosacral spine were normal.

The ALJ also considered the evidence by treating doctors in many of Plaintiff's hospital visits.  Indeed, Plaintiff complained consistently, during the relevant period of time, of the pain in her chest, which she contends is one of the reasons why she stopped working.  In April 1997, Plaintiff was seen at the Jersey Shore Medical Center for chest pressure that had resolved by the time she arrived.  Tests were unremarkable, no significant disease was found after a catheterization, her blood pressure was well controlled, her lungs were clear, and her heart rate and rhythm were normal. Plaintiff's chest x-rays showed no evidence of cardiac failure or acute pulmonary disease.  In August 1997, Plaintiff again went back to the hospital for complaints of chest pain and pressure.  Her stress tests were unchanged from her prior tests.  Another

catheterization of the right coronary artery showed minimal luminal irregularities with no significant stenosis, and chest x-rays showed no cardiomegaly or mediastinal widening and essentially clear non-congested lungs. Plaintiff's hospital visit on November 1999 had similar results.

Finally, the ALJ considered Plaintiff's and other witnesses' testimonies. The Court is cognizant that the ALJ is entitled to evaluate credibility, but he cannot reject testimony without explanation. VanHorn v. Schweiker, 717 F.2d 871, 873 (3d. Cir. 1983). Rejection of subjective testimony must be based on substantial evidence. Id. at 873-74. Nevertheless, the ALJ has the authority to render an independent judgment in light of the medical findings and other evidence regarding the true extent of Plaintiff's complained symptoms. LaCorte v. Bowen, 678 F.Supp. 80, 83 (D.N.J. 1988). Plaintiff testified before the ALJ that the side effects of her medication resulted in headaches and nausea. Due to her heart problems, she allegedly suffered from shortness of breath, sleep difficulties, and was constantly tired. Plaintiff also complained of right handed numbness and occasional pain, which she claimed is the reason why she could only walk about one half block, could not sit long, and rarely drove a car. Ms. Witcher, Plaintiff's sister, corroborated Plaintiff's allegations. Nonetheless, the ALJ specifically stated in his decision that in light of the objective medical reports from treating and examining

practitioners who saw Plaintiff, her alleged symptoms seemed somewhat exaggerated.  Particularly since, during the relevant period of time, Plaintiff performed light chores around the house (i.e., sewed, dusted, and washed dishes).  Plaintiff also drove to see her mother or had a friend drive her there at least once weekly.  Plaintiff also went to church on Sundays, and took a trip to Florida.  More importantly, Plaintiff was actively looking for employment in September 1999.  Even Plaintiff's own statements during a visit with Dr. Petersen suggested that her knee problem did not prevent her from being able to perform her daily activities and was not the basis for her disability.  As such, the ALJ properly discounted the testimony of Plaintiff and other witnesses based upon substantial evidence.

Plaintiff further argues that the ALJ ignored or minimized non-exertional limitations as established by the medical evidence and testimony at the hearing.  However, Plaintiff never explicitly identifies the limitations she is claiming, nor does Plaintiff point to any credible medical evidence that would substantiate her claims.  It appears from reviewing Plaintiff's submissions that she allegedly suffered from an unexplained mental impairment and side effects from her medications, which she complained about during the hearing.[8]  As discussed above, the ALJ discredited Plaintiff's

---

[8]To the extent Plaintiff argues that her subjective symptoms of "pain, fatigue, shortness of breath, weakness, or nervousness" should have been considered by the ALJ, the Court finds that

testimony based on overwhelming medical evidence to the contrary. As such, the Court finds Plaintiff's argument without merit.

Based upon the determination of Plaintiff's RFC, the ALJ properly concluded that Plaintiff could not perform any of her past relevant work as a store marker and office cleaner.

### 3.   Step Five: Whether Plaintiff was Able to Perform Work Available in the National Economy

Plaintiff argues that ALJ's total reliance on the Medical Vocational Guidelines ("MVG") is misplaced.  Plaintiff further argues that the ALJ ignored the vocational expert's testimony of Plaintiff's total disability status when determining whether there was other work available in the national economy for Plaintiff. However, in reviewing the ALJ's decision, the Court finds that the ALJ relied on not only the MVG, but also on the vocational expert's testimony with respect to the hypothetical posed.  As such, the ALJ's decision at Step Five was based on substantial evidence.

At Step Five of the sequential analysis, once a claimant satisfies her initial burden of proof by showing that she is unable to return to her PRW the burden shifts to the Commissioner to prove that there is some other substantial gainful employment she is able to perform.  Kangas v. Bowen, 823 F.2d 774, 777 (3d Cir. 1987). The Commissioner's burden at Step five is generally satisfied by

---

argument to be without merit.  To reiterate, the ALJ had previously discredited some of these symptoms based upon objective medical evidence, and Plaintiff's own inconsistent statements during the relevant period of time.

referring to the MVG.  20 C.F.R. §§ 404.1569 and 416.969; Heckler v. Campbell, 461 U.S. 458 (1983); Sykes v. Apfel, 228 F.3d 259 (3d Cir. 2000).  However, the MVG is not fully applicable when a claimant has non-exertional impairments. 20 C.F.R. § 200.00(e)(2); Mac v. Sullivan, 811 F.Supp. 194, 198 (E.D. Pa. 1993).  If a claimant has both exertional and non-exertional impairments, the MVG is not to be used unless it directs a finding of disabled.  Id. In such circumstances, the MVG does not establish the existence of jobs, and a full consideration must be given to all of the relevant facts of the case. Burnam v. Schweiker, 682 F.2d 456, 458 (3d Cir. 1982).  Vocational expert testimony is necessary where it was improper to apply the MVG. Jesurum v. Secretary, 48 F.3d 114, 120 (3d Cir. 1995).

      Here, Plaintiff's arguments fail in light of the ALJ's decision. Having determined that Plaintiff cannot perform her PRW, the ALJ first utilized the MVG in conjunction with Plaintiff's age, education and vocationally relevant past work experience. He found that Plaintiff was born on November 5, 1951; she was 44-years old on December 5, 1995 (the alleged onset date).  Pursuant to the Regulations, she was a younger individual (20 C.F.R. §§ 404.1563 and 416.963).  She has a high school education and an unskilled background.  Together with Plaintiff's RFC (previously determined by the ALJ), the ALJ found that Plaintiff was capable of performing

36

a wide or significant range of sedentary work.[9]  Pursuant to the MVG, alone, Plaintiff's conditions would warrant a "not disabled" status.  However, because the ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of sedentary work may have been slightly impeded by additional exertional and/or non-exertional limitations, an impartial vocational expert's testimony was solicited in determining whether there were a significant number of jobs in the national economy that Plaintiff could perform given her RFC and other vocational factors.  Indeed, after being posed the hypothetical by the ALJ, the vocational expert testified that based on all the relevant factors, Plaintiff could work as a surveillance systems monitor and as an information clerk.[10]  The ALJ then found the hypothetical question accurately described an individual of Plaintiff's vocational background and functional limitations; Plaintiff was found to be capable of making

---

[9]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

[10]The ALJ asked the vocational expert to assume an individual who was limited to performing a wide or significant range of sedentary work; i.e., the hypothetical worker could lift and carry up to ten pounds, and could stand for one hour, walk for one hour and sit for six hours in an eight-hour workday.  However, the hypothetical worker also required the option to be able to sit or stand at will, and could only use her right (dominant) upper extremity occasionally.

a successful adjustment to work that exists in significant numbers in the national economy. As such, the ALJ concluded that Plaintiff was not disabled within the purview of the SSA.

The brunt of Plaintiff's self-serving argument is based on limitations which were proffered by Plaintiff's own counsel. Indeed, the vocational expert testified, based on Plaintiff's proposed hypothetical limitations – that such a person would not be able to work where an individual needed to rest for several hours a day, stop for a few minutes due to occasional chest pains, or leave the workstation to lay down. However, as discussed above, the ALJ did not find Plaintiff's testimony fully credible on these issues because it was at odds with, and exaggerated, the medical record. The Court finds that a hypothetical does not need to include every impairment that Plaintiff alleges, rather the question must reflect these impairments were supported by the medical record. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005). Therefore, it is appropriate for the ALJ to not accept the vocational testimony based upon Plaintiff's own assertions, which the ALJ reasonably determined were not medically supported by the evidence and therefore, were not controlling.[11]

---

[11]It is important to note that Plaintiff did not question the validity of the ALJ's hypothetical posed to the vocational expert in light of Plaintiff's RFC. In fact, Plaintiff's argument rests on the fact that ALJ should have given more weight to the vocational testimony based upon Plaintiff's own subjective assessment and complaints.

**III. CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision is supported by substantial evidence in the record.   Accordingly, the decision is affirmed and Plaintiff's Complaint is dismissed.

An appropriate Order shall follow.


/s/   Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge


Date: December 20, 2007